**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**MILWAUKEE DIVISION**

| | | |
|---|---|---|
| DEREK GUBALA, individually and on behalf of all others similarly situated, | ) | |
| Plaintiff, | ) | Case No. 15-cv-1078 |
| v. | ) | Hon. J.P. Stadtmueller |
| TIME WARNER CABLE, INC., a Delaware corporation, | ) | |
| Defendant. | ) | |

**SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiff Derek Gubala ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his counsel, Siprut PC, brings this Amended Class Action Complaint against Defendant Time Warner Cable, Inc. ("TWC"). Plaintiff, on his own behalf and on behalf of a class of similarly situated individuals, alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys:

## I. NATURE OF THE ACTION

1. Cable and satellite television are a staple in American households, viewed by many to be as ordinary and essential as gas and electric service. As a rapidly expanding provider of cable services throughout the nation, Defendant TWC uses its position to collect personal information—such as names, addresses, social security numbers, and credit card numbers—from tens of millions of consumers across the country.

2. After consumers terminate their service with TWC, this information is no longer needed to provide service or collect payment. However, TWC continues to maintain personally

identifiable information on all of its previous customers indefinitely. This conduct violates the Cable Communications Policy Act, 47 U.S.C. § 551 *et seq.* ("CCPA"), which requires cable operators to destroy personally identifiable information when it is no longer required for the purpose for which it was collected.

3. Accordingly, Plaintiff seeks only injunctive relief, on his own behalf and on behalf of the other members of the below-defined Class, against TWC for violations of the CCPA, 47 U.S.C. § 551(e).

## II. JURISDICTION AND VENUE

***Subject Matter Jurisdiction***

4. This Court has subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331, because it arises under the laws of the United States.

***Personal Jurisdiction***

5. This Court has personal jurisdiction over Defendant TWC, pursuant to the Wisconsin long-arm statute, Wis. Stat. § 801.05(1)(d), because TWC transacts business in Wisconsin by entering into contracts with customers, resellers of its services, equipment suppliers, and other cable companies. Because TWC maintains a presence in this State, this Court has personal jurisdiction over TWC.

***Venue***

6. Venue is proper in this District, pursuant to 28 U.S.C. § 1391(b)(1), because TWC resides in this District. As a corporation, TWC's residency is based on it being subject to personal jurisdiction in this District. This District has general personal jurisdiction over TWC because TWC maintains continuous and systematic contacts in this District through its contracts,

as stated above. Venue is further proper in this District, pursuant to § 1391(b)(2), because TWC provided the services giving rise to the claim in this District.

## III. PARTIES

***Plaintiff***

7. Plaintiff is a natural person currently domiciled in Bolingbrook, Illinois.

8. At all times relevant to this Complaint, Plaintiff was a resident of Oak Creek, Wisconsin and received services from TWC at his Wisconsin residence.

***Defendant***

9. TWC is a corporation organized in and existing under the laws of the State of Delaware with its principal place of business located at 60 Columbus Circle in New York City, New York.

## IV. FACTUAL BACKGROUND

***The Cable Communications Policy Act***

10. On October 30, 1984, Congress passed the CCPA in order to promote competition among providers of cable services and establish a national policy concerning cable communications and their operators. An important objective of Congress in establishing such a policy was to protect cable subscribers' sensitive personal information from misuse and improper disclosure. To that end, Congress made sure that the Act incorporated privacy guidelines jointly established several years earlier by the 34 nations comprising the Organization for Economic Cooperation and Development.

11. When the CCPA was under debate, legislative leaders noted that both common-sense privacy concerns and the constitutional rights of citizens were at stake:

> Cable systems, particularly those with a 'two-way' capability, have an enormous capacity to collect and store personally identifiable

> information about each cable subscriber. Subscriber records from interactive systems can reveal details about bank transactions, shopping habits, political contributions, viewing habits and other significant personal decisions. It is [therefore] important that national cable legislation establish a policy to protect the privacy of cable subscribers. A national policy is needed because, while some franchise agreements restrict the cable operator's use of such information, privacy issues raise a number of federal concerns, including protection of the subscribers' first, fourth, and fifth amendment rights. At the same time, such a policy must also recognize and unnecessarily or unreasonably impede those flows of information necessary to provide the service to the subscribers.

H.R. Rep. 98-934 at 4666-67 (1984).

12. These observations, now nearly 30 years old, are just as relevant today. Subscribers continue to disclose some of their most sensitive identifying information to their cable operator as a condition to entering into a contract for service. Now—far more than ever before—TWC and other cable operators are equipped to rapidly collect and indefinitely retain large volumes of this valuable data in their electronic records.

13. There are numerous serious and troubling privacy issues implicated by TWC's practice of retaining and misusing their former customers' personal information, including the risk of identity theft and conversion of personal financial accounts.

14. Accordingly, the CCPA affords consumers significant protection with respect to the collection, maintenance, and disclosure of personally identifiable information ("PII") provided by the subscriber to the cable operator.

15. Specifically, the CCPA requires cable operators to provide annual notice setting forth the "nature of personally identifiable information collected"; "the nature, purpose, and frequency of any disclosure" of that information; the "period during which such information will be maintained"; "the times and place at which the subscriber may have access to such

information"; and the limitations imposed on the cable operator by this provision of the CCPA. 47 U.S.C. § 551(a)(1).

16. In addition, the CCPA governs the way that cable operators are to destroy the PII of former subscribers. The CCPA requires that cable operators must destroy the PII of former subscribers "if the information is no longer necessary for the purpose for which it was collected" and there are no outstanding requests or orders for such information. 47 U.S.C. § 551(e).

17. Under the CCPA, "personally identifiable information" is not specifically defined. However, the courts have concluded that it broadly encompasses "specific information about the subscriber, or a list of names and addresses on which the subscriber is included." *See, e.g.*, *Scofield v. Telecable of Overland Park, Inc.*, 973 F.2d 874, 876, n.2 (10th Cir. 1992).

***Defendant TWC's Collection of Consumers' PII***

18. Defendant TWC has been in existence since 1989, when it was formed through the merger of Time, Inc.'s cable division and Warner Cable. TWC has continued to grow rapidly, offering a range of services that includes cable television, DVR services, and digital phone subscriptions. TWC serves more than 20 million cable customers, nearly 9 million high-speed Internet customers, and more than 4 million voice customers. In 2012, the company earned nearly $21.4 billion in gross revenues and had a profit of approximately $2.2 billion.[1]

19. TWC requires that subscribers provide PII to TWC in order to receive cable service, including social security numbers and/or driver's license numbers, date of birth, street addresses, phone numbers, and credit card numbers, credit information, and account information.

[1] *See Company Overview, Our History*, http://www.timewarnercable.com/en/about-us/company-overview.html (providing Time Warner's company history) (last visited Oct. 13, 2015), attached hereto as Exhibit A.

20. Once TWC obtains that information, it maintains a digital record system with every subscriber's personal information, adding to each consumer's file as they acquire more information.

21. TWC's online Privacy Policy provides, in pertinent part, as follows:

> We maintain personally identifiable information about subscribers for as long as it is necessary for business purposes. This period of time may last as long as you are a subscriber and, if necessary, for additional time so that we can comply with tax, accounting and other legal requirements. When information is no longer needed for these purposes, it is our policy to destroy or anonymize it.[2]

***Defendant TWC's Unlawful Retention of Consumers' PII***

22. At all relevant times, TWC's uniform policy and practice has been to retain customer PII indefinitely, long after customers' accounts have been terminated.

23. While TWC's Privacy Policy claims that consumer information is destroyed after it is no longer needed for business, tax, accounting, or legal purposes, in practice, TWC simply retains consumers' PII indefinitely. Moreover, "anonymizing" the data does not constitute compliance with the CCPA.

24. Defendant TWC's indefinite retention of PII is prohibited by the CCPA, which requires cable operators to "destroy personally identifiable information if the information is no longer necessary for the purpose for which it was collected." 47 U.S.C. § 551(e).

***Consumers Place a High Value on Their PII***

25. At a Federal Trade Commission ("FTC") public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information as follows:

---

[2] Time Warner Cable, Privacy Notice, ¶4 http://help.twcable.com/html/twc_privacy_notice.html (last visited Oct. 13, 2015), attached hereto as Exhibit B.

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.

Transcript of Public Workshop: The Information Marketplace: Merging and Exchange Consumer Data (8:2-8) (Mar. 13, 2001), *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

26. Though Commissioner's Swindle's remarks are more than a decade old, they are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 billion per year online advertising industry in the United States.[3]

27. The FTC has also recognized that consumer data is a new—and valuable—form of currency. In a recent FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point by observing:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.

*Statement of FTC Commissioner Pamela Jones Harbour* (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited May 28, 2015).

28. Recognizing the high value that consumers place on their PII, many companies now offer consumers an opportunity to sell this information to advertisers and other third parties.

[3] *See* Julia Angwin, *Web's Hot New Commodity: Privacy*, The Wall Street Journal (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited Oct. 13, 2015), attached hereto as Exhibit C.

The idea is to give consumers more power and control over the type of information that they share—and who ultimately receives that information. And by making the transaction transparent, consumers will make a profit from the surrender of their PII.[4] This business has created a new market for the sale and purchase of this valuable data.[5]

29. In fact, consumers not only place a high value on their PII, but also place a high value on the *privacy* of this data. Thus, the question is not *whether* consumers value such privacy; the question is "*how much* [consumers] value" that privacy.[6]

30. Researchers have already begun to shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when [retailers'] privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[7]

31. Consumers thus value their personal data highly, and place an economic value on the privacy of that data. In fact, when consumers were surveyed as to how much they valued their personal data in terms of its protection against improper access and unauthorized secondary use—two concerns at issue here—they valued the restriction of improper access to their data at between $11.33 and $16.58 per website, and prohibiting secondary use to between $7.98 and $11.68 per website.[8]

---

[4] *See* Steve Lohr, *You Want My Personal Data? Reward Me for It*, The New York Times (July 17, 2010), http://www.nytimes.com/2010/07/18/business/18unboxed.html (last visited Oct. 13, 2015), attached hereto as Exhibit D.

[5] *See* Angwin, *supra*, note 4.

[6] Hann et al., *The Value of Online Information Privacy: An Empirical Investigation* (Mar. 2003) at 2, *available at* http://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (emphasis added) (last visited Aug. 31, 2015).

[7] Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (June 2011).

[8] *Id.*

32. Given these facts, any company that transacts business with a consumer and then retains that consumer's PII in contravention of statutorily guaranteed privacy protections has thus deprived that consumer of the full value of the consumer's transaction with the company.

***Facts Pertaining to Plaintiff***

33. On or about December 27, 2004, Plaintiff signed up for Defendant TWC's cable services. In order to activate his service, TWC required Plaintiff to provide TWC with various forms of PII, including his date of birth, address, home and work telephone numbers, social security number, and credit card information.

34. On or about September 28, 2006, Plaintiff canceled his service with Defendant TWC.

35. On or about December 4, 2014, Plaintiff contacted Defendant TWC and confirmed that all of the PII that he originally submitted back in 2004 remains in TWC's billing records.

36. TWC currently retains the PII of Plaintiff and other members of the Class for whom services have been terminated.

## V. CLASS ACTION ALLEGATIONS

37. Plaintiff brings this action, as set forth below, on behalf of himself and as a class action, pursuant to the provisions of Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure on behalf of a class defined as:

> All persons in the United States who signed up for cable service with Time Warner Cable, Inc., and whose personally identifiable information was retained by Time Warner Cable, Inc. after the termination of services (the "Nationwide Class").

Excluded from the Nationwide Class are: TWC and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and any immediate family members thereof.

38. Certification of the Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

39. **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the class are so numerous that individual joinder of all Class members in impracticable. On information and belief, there are thousands of consumers who have been affected by TWC's wrongful conduct. The precise number of the Class members and their addresses is presently unknown to Plaintiff, but may be ascertained from TWC's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

40. **Commonality – Federal Rule of Civil Procedure 23(a)(2).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a. Whether Defendant TWC must destroy customers' PII after termination of services;

b. Whether Defendant TWC has retained its customers' PII after the termination of services;

c. Whether Defendant TWC's conduct as alleged herein violates the CCPA and the Illinois Cable Act; and

d. Whether Plaintiff and other Class members are entitled to injunctive relief.

41. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the uniform misconduct described above.

42. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4)**. Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class members he seeks to represent; he has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously. The Class members' interests will be fairly and adequately protected by Plaintiff and his counsel.

43. **Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendant TWC has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief, as described below, with respect to Class members as a whole.

## VI. CLAIM ALLEGED

### COUNT I
### Failure to Destroy Personally Identifiable Information
### Violation of § 551(e) of the Cable Communications Policy Act
### (On Behalf of the Nationwide Class)

44. Defendant TWC is a "cable operator" as defined by the CCPA because TWC provides "cable services," which is "the one-way transmission to subscribers of [ ] video programming, or [ ] other programming service; [and] subscriber interaction, if any, which is required for the selection or use of such video programming or other programming service." 47 U.S.C. § 522(5) & (6).

45. The CCPA mandates, among other things, that a cable operator "destroy personally identifiable information if the information is no longer necessary for the purpose for which it was collected." 47 U.S.C. § 551(e).

46. After Plaintiff's and the Class members' accounts were terminated, Defendant TWC continued to maintain Plaintiff's and the Class members' PII, even though such information was no longer necessary to maintain for the purpose for which it was collected.

47. The foregoing conduct violates 47 U.S.C. § 551(e).

48. Plaintiff and the Class have suffered injuries as a result of TWC's violation of 47 U.S.C. § 551. TWC's failure to destroy their PII, as required 47 U.S.C. § 551, constitutes injury in the form of a direct invasion of their federally protected privacy rights.

49. Moreover, since Plaintiff and the Class purchased cable services from TWC, and TWC was obligated to comply with the CCPA, TWC's failure to destroy their PII deprived them of the full value of the services that they bargained and paid for. Because Plaintiff and the Class ascribe monetary value to their ability to control their PII, Plaintiff and the Class have sustained, and continue to sustain, injuries as a direct and proximate result of TWC's violation of 47 U.S.C. § 551.

50. The CCPA provides a private right of action to consumers who have been aggrieved by a violation of 47 U.S.C. § 551. Specifically, any person aggrieved by any act of a cable operator violating 47 U.S.C. § 551 may recover any "lawful remedy available to a cable subscriber." 47 U.S.C. § 551(f)(3).

51. Plaintiff, on behalf of himself and the Class, therefore seeks only injunctive to the full extent permitted by the CCPA.

## VII. REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter an Order:

A. Declaring that this action may be maintained as a class action, and certifying the Class as requested herein;

B. Enjoining TWC from the unlawful practices and statutory violations asserted herein; and

C. Granting such other and further relief as may be just and proper.

Dated: November 20, 2015

Respectfully submitted,

By: */s/ Joseph J. Siprut*

Joseph J. Siprut
*jsiprut@siprut.com*
Richard L. Miller II
*rmiller@siprut.com*
Ismael T. Salam
*isalam@siprut.com*
**SIPRUT PC**
17 N. State Street
Suite 1600
Chicago, Illinois 60602
Phone: 312.236.0000
Fax: 312.241.1260

Jacob E. Miota
*jmiota@miotalaw.com*
**MIOTA LAW LLC**
1400 E. Olive Street
Shorewood, Wisconsin 53211
Phone: 414.973.9305
Fax: 414.386.4675

4819-4161-6169, v. 1

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a true and correct copy of the foregoing **Second Amended Class Action Complaint** was filed this 20th day of November 2015 via the electronic filing system of the Eastern District of Wisconsin, which will automatically serve all counsel of record in this action.

*/s/ Joseph J. Siprut*

4849-5911-3514, v. 1